IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ALONZO MOSLEY, | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 11 C 08633 |
| | ) | |
| EDWARD LEGENZA, and | ) | Magistrate Judge |
| JAMES LOONEY, | ) | Weisman |
| Defendants. | ) | |

**PLAINTIFF'S MOTIONS IN LIMINE**

Defendant, ALONZO MOSLEY, through his attorney, Sheldon B. Nagelberg, moves, in limine, for rulings prohibiting the Defendants from introducing at trial in this cause the following evidence:

**I. PROHIBITING DR. SANCHEZ FROM OPINING AS TO WHETHER THE ABRASIONS ON THE RIGHT HAND OF EDWARD LEGENZA WERE THE RESULT OF A HUMAN BITE.**

Pursuant to the Federal Rules Of Evidence 403, 701, and 702, Plaintiff seeks a ruling, *in limine*, prohibiting the Defendants from eliciting at trial an opinion from Maria Sanchez, MD, an emergency room internist, Little Company of Mary Hospital, that either they have an opinion that the marks on the hand of Chicago Police Officer Legenza were caused by a human bite mark, or "are consistent with a human bite mark". In support of this relief is offered the following:

1. The medical diagnosis of a human bite mark on either a deceased or living person is known as forensic odontology. The American Board of Forensic Odontology ("ABFO") was established to create scientific standards for those who practice forensic odontology and to certify as qualified specialists who comply with the standards of

1

the ABFO so as to regulate competence in this area. <u>Exhibit One</u> contains the (a) ABFO's qualifications in order to be certified as a member and qualified as a forensic odontologist, (b) the ABFO "Bitemark Analysis Guidelines, and (c) "Bitemark Terminology Guidelines.

    2. The need for strict adherence to the ABFO standards has been exemplified by cases in which purported forensic bite mark experts have offered opinions in courts claiming that a defendant caused a bite mark on a victim, when subsequent DNA analysis exonerated the defendant. Such exonerations have prompted critics of bite mark analysis to claim that such opinions lack reliability. It is for this reason that any purported opinion in the field of forensic odontology be made in strict compliance with the standards and analytic protocol of the ABFO.

    3. During the Obama Administration, the President's Council of Advisors on Science and Technology, in a 2016 report, titled, "Forensic Science in Criminal Courts:Ensuring Scientific Validity of Feature-Comparison Methods" reviewed feature-comparison disciplines, or pattern-matching practices, i.e., bite-mark analysis, shoe tread analysis, DNA mixture anal;ysis, firearm analysis. In the case of bite-mark analysios, the report found that bitemark analysis does not meet the scientific standards for foundational validity, in that examiners cannot consistently agree on whether a human injury is a human bitemark, and if so, cannot identify the source of a bitemark with reasonable accuracy.

    4. In 2016 the Texas Forensic Science Commission called for a ban of bite mark analysis, and placed the burden on forensic odontologists to conduct better research to support their claims that the analysis complies with both *Daubert* and *Frye.*

5. On July 6, 2015, as a result of Plaintiff's counsel's concerns as to a lack of clarity in Defendants' FRCvP Rule 26 disclosure of Dr. Sanchez expected testimony, ACC Caroline Fronczak wrote a letter, which in pertinent part states:

" Defendants do not have any expectation, nor do Defendants intend to elicit any testimony, that Dr. Sanchez has any opinion one way or the other wither PO Legenza <u>actually</u> suffered a human bite wound by Plaintiff. Put simply, and as stated in the May 20, 2015 supplemental disclosure, Defendants expect Dr. Sanchez to testify consistently with the medical records and the fact that PO Legenza complained of a human bite wound, and she treated it as such."

\* \* \* \* \* \* \* \* \*

"Once again Defendants DO NOT expect that Dr. Sanchez will offer any testimony that opines on causation, future medical prognosis, or whether the bite wound suffered by PO Legenza was in fact, a human bite wound, produced by Plaintiff. Further, Defendants have specifically not disclosed these opinions because they are not contained in the medical records."

<u>Exhibit Two</u>, Letter of ACC Fronczak to Plaintiff's counsel.

6. In October, 2015 Dr. Sanchez was deposed. Attached as <u>Exhibit Three</u> is the examination of Dr. Sanchez by Plaintiff's counsel. Following are salient statements by Dr. Sanchez:

> "A. Internal medicine is the practice of medicine. Basically taking care of adults 18 years and older. We're not involved in surgical procedures. It's basically treating medical illnesses."
>
> P. 34, L. 12-16.
>
> "Q. And would it be fair to say that internal medicine is somewhat of a general practice for adults?
>  A. That's correct.."
>
> P. 36, L. 2-5.
>
> "Q. Have you ever heard of the expression forensic odontology?
> A. No.
> Q. Do you have any specialized training in the area of odontology?
> A. No."
>
> P. 39, L.21-24; P.40, L.1-2.

3

"Q. And would it be fair to say, and you correct me if I'm wrong, for us lawyers a subjective symptom is what the patient says happened to him and the objective—the objective symptom is what the medical specialists arrives at a conclusion based on observations or tests, et cetera, given—given in the –by the medically trained person, correct?
A. That's correct."

P.36, L. 20-24; P.37, L. 1-5.

"Q. Now do you recall if you took a measurement of the—of officer Legenza's hand?
    *    *    *    *    *    *    *
Q. Well, let me finish. My question is not about the size of each of the particular abrasions or wounds, but the distance across the knuckle area where the four marks from the second, third, fourth, and fifth. If you measured across the distance there?
A. No. I didn't."

P.54, L.2-4; L15-22.

"Q. And when you – when you saw his hands or you saw the –those marks did you--on the knuckle area of the second, third, fourth, and fifth, which appeared to be in a row, did you question officer Legenza about his statement that he was bitten?
 (witness asks question be repeated)
Q. ….Did you ask officer Legenza if possibly those marks came from some other type of contact in light of the position of those marks?
A. I can only say what I've written in my notes. So I have no recollection if I ask him any other question other than what I wrote in my notes.
    *  *  *  *  *  *  *  *  *
Q. At the time that you were treating officer Legenza did you feel it was important for yourself to see the mouth and the teeth structure of Mr. Mosley, the person who Legenza stated was the person who bit him?
A. I believe I did not see Mr. Mosley nor treated him nor even seen or evaluated him. I—I did not. I do not know Mr. Mosley."

P. 57, L.16-21; P.58, L. 14-21; P. 59, L3-12

## II. PROHIBITING THE DEFENDANTS FROM INTRODUCING EVIDENCE OF THE PLAINTIFF'S PLEA OF GUILTY TO MISDEMEANOR BATTERY.

7. In February, 2014, more than 4 years after the December 5, 2009 stop and seizure by the Defendants, the Plaintiff, on a day in which jury trial was to commence,

4

entered a plea of guilty to misdemeanor battery, by reason of his having offensive contact with the person of Defendant Edward Legenza while waving his hands in protest to being stopped by the defendants.

Now the Defendants wish to introduce evidence of this plea before the jury impaneled to decide whether the stop and seizure of Plaintiff was lawful, and whether excessive force was used by the defendants.

8. The question which must be asked, since the jury will not be asked to decide the merits of a claim of false arrest, of what probative value, or relevance is this plea to the facts and circumstances that occurred on December 5, 2009? How will this plea aide the jury in deciding the merits of Plaintiff's claims of unlawful stop and excessive force? Certainly the Plaintiff has never denied that, while waving his arms in protest, they came in contact with Defendant Legenza, nor does Plaintiff deny that he entered a plea to this misdemeanor. At trial, the Plaintiff, in describing his behavior and movements on December 5, 2009, will describe that he waved his arms in protest to being stopped by the defendants, and while waving he touched the person of Defendant Legenza.

9. The only effect that feeding this plea to the ears of the jury will be to confuse the issues, distract away from the issues, mislead the jury, and causing unfair prejuduice to Plaintiff. Thus, pursuant to FRE 403 this misdemeanor plea should not be admitted into evidence by the Defendants at trial.

10. Nowhere in any of the Chicago Police reports generated on or about December 5, 2009 to document the events of the incident, is there mention of Plaintiff

committing a simple battery by offensive touching of defendant Legenza; what the police reports say is that Plaintiff bit the hand of Defendant Legenza, and was charged with the felony of Aggravated Battery To a Peace Officer.

11. The Plaintiff has always asserted that he never bit officer Legenza, and that the abrasions on the knuckles of Legenza's right hand were caused by Legenza himself when he was straddled over Plaintiff in the ground with his hands around Plaintiff's head and neck. Plaintiff claims that Defendant Legenza knew that he was not the victim of a bite, but chose to use the knuckle abrasions as a convenient lie so that the charge against Plaintiff would be a felony, serving as a just "payback" for Plaintiff's protesting and lack of cooperation.

12. But the payback would not end with the felony charge of of aggravated battery. On January 11, 2010, some 36 days after the incident, CPD Detective Michael Adams is called to testify before a Cook County Grand Jury regarding Defendant Legenza's claim of being bitten by Plaintiff. Although Det. Adams interviews Plaintiff, post Miranda at 1:40 P.M. on December 5, 2009 at the police station, wherein Plaintiff states:

"I did not bite police officer. He hurt his hand during struggle when all fell down"

<u>Exhibit Six</u>, Adams General Progress Report,

Adams then perjurs himself when he states:

"Q. (States Attorney) Did he state in summary, that he did bite the officer, but that the officer hurt his hand when he fell on the ground?

A. Det. Adams: Yes."

<u>Exhibit Four</u>, Transcript Grand Jury, p. 5, L. 5-12.

6

13. Plaintiff claims that Det. Adams was contacted by one or both Defendants and agreed to change the denial made by Plaintiff when Adams interviewed him on December 5, 2009, to an admission of guilt.

14. Despite the attempts of Plaintiff's counsel, who also defended Plaintiff in the State prosecution, to raise the issue of Det. Adams perjury before the Grand Jury in a Motion To Dismiss Indictment, see Exhibit Five, the trial court denied the relief.
It is a sad commentary on the justice system when this clear material evidence of perjury is known to the Chicago Police Department, IPRA, the Cook County Circuit Court, the Cook County States Attorney, and the City of Chicago Corporation Counsel, yet no one has ever brought an investigation of this dishonesty. Even, in this cause, Defendants' counsel seeks to suppress the use of this Grand Jury transcript (Exhibit Four), claiming that Plaintiff's counsel has violated Illinois state law by publishing the transcript without authority, even though the transcript was an exhibit made part of the Motion To Dismiss Indictment (Exhibit Five).

        Respectfully submitted,

        _____
        SHELDON NAGELBERG
        Attorney for Plaintiff

Sheldon B. Nagelberg
53 West Jackson Boulevard
Suite 664
Chicago, IL. 60604
312-305-5278
sbnagelberglaw@att.net